JUDGE CAPRONI

# 18 CV 9160

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---

CABOT SQUARE LLC, *ex rel*
THE UNITED STATES OF AMERICA,

      Plaintiff,

 - against -

FULCRUM CAPITAL HOLDINGS LLC;
MATTHEW HAMILTON;
TIMOTHY HORRIGAN;
FONDACO SGR S.p.A.;
COMPAGNIA DI SAN PAOLO, and
CARAC,

     Defendants.

NO. 18 Civ. _____

**FILED IN CAMERA AND
UNDER SEAL PURSUANT TO
31 U.S.C. §§ 3729-31**

COMPLAINT

JURY TRIAL DEMANDED

---

### QUI TAM (FALSE CLAIMS ACT) COMPLAINT

The United States of America, by and through *qui tam* Relator Cabot Square LLC ("Cabot Square"), brings this action under 31 U.S.C. §§ 3729-32 (the "False Claims Act" or "FCA") to recover from Fulcrum Capital Holdings LLC, Matthew Hamilton, Timothy Horrigan, Fondaco, Compagnia di San Paolo, and CARAC (collectively, "Defendants") all damages, penalties, and other remedies available under the False Claims Act on behalf of the United States and Cabot Square, and alleges on the basis of its personal knowledge as follows:

### Introduction

1. This case is about a fraud upon the United States and, indirectly, upon the victims of what was already amongst history's most awful and notorious frauds. Defendants Fulcrum Capital Holdings LLC, Matthew Hamilton, Timothy Horrigan, Fondaco, Compagnia di San Paolo, and CARAC filed, or caused to be filed, false claims to the Madoff Victim Fund, which the U.S.

Department of Justice established to compensate victim of the Madoff Securities fraud. As a result of their false claims, Defendants have received and stand to receive millions of dollars that ought to have been distributed by the United States to legitimate victims of the Madoff fraud. Instead, the money was misappropriated to defendants Fulcrum Capital Holdings LLC and its principals, Matthew Hamilton and Timothy Horrigan.

2.   From at least in or about the early 1970s until December 11, 2008, Bernard L. Madoff perpetrated the largest Ponzi scheme in history, defrauding thousands of victims out of tens of billions of dollars by promising to buy stocks and bonds that, in reality, simply did not exist.

3.   Madoff was arrested in December 2008, and was subsequently convicted and sentenced to 150 years' imprisonment. The United States Attorney's Office for the Southern District of New York ultimately convicted, by guilty plea or at trial, fifteen different defendants for their role in the Madoff fraud, and obtained criminal forfeiture judgments of many billions of dollars. The U.S. Attorney's Office also recovered billions of dollars through civil forfeiture from certain of Madoff's long-time customers, and through a Deferred Prosecution Agreement with JPMorgan Chase Bank, N.A., Madoff's primary bank.

4.   In total, the U.S. Attorney's Office collected at least approximately $4 billion in cash through civil and criminal forfeiture, which it announced would be returned to victims of the Madoff fraud through the Department of Justice's remission or mitigation process, via the Madoff Victim Fund.

5.   The Madoff Victim Fund began accepting claims for remission or mitigation in late 2013, and as of September 2018 had distributed more than $1.25 billion to over 28,000 recognized victims of the Madoff fraud in more than 120 different countries.

6.  To ensure that the money recovered by the Madoff Victim Fund is distributed equitably, the Department of Justice requires that any claimant provide information about "collateral recoveries," meaning other money that the victim has received from any source – such as insurance, private lawsuits or settlements, or the court-supervised liquidation of Madoff's firm.  In general, collateral recoveries are dollar-for-dollar offsets to what the Madoff Victim Fund would otherwise distribute to a victim.  As of the filing of this complaint, the Madoff Victim Fund has received information about more than 51,000 collateral recoveries to victims, which the Department of Justice considers in recognizing claims.

7.  Defendants filed false claims to the Madoff Victim Fund by, among other things, fraudulently failing to disclose millions of dollars in collateral recoveries.  As a result of these false claims, the Department of Justice caused millions of dollars more to be paid out to the defendants than they should have received.  This lawsuit seeks to hold defendants responsible for their false claims against the United States.

### Parties

8.  Relator Cabot Square LLC ("Cabot Square") is a limited liability corporation formed in the State of Delaware.

9.  Defendant Fulcrum Capital Holdings LLC ("Fulcrum") is a Delaware limited liability corporation with its principal place of business located at 111 Congress Avenue, Austin, Texas 78701.

10. Defendant Matthew Hamilton is a managing member of Fulcrum and resides in Austin, Texas.

11. Defendant Timothy Horrigan is a managing member of Fulcrum and resides in Austin, Texas.

12. Defendant Fondaco SGR S.p.A. is an institutional asset management company based in Torino, Italy, with assets managed on behalf of over thirty partners.

13. Defendant Compagnia di San Paolo is a large foundation based in Torino, Italy with assets that are managed by Fondaco.

14. As relevant to the false claims alleged herein, personnel from both Compagnia di San Paolo and Fondaco SGR S.p.A. were involved in virtually every action relevant to either one of them, and on virtually every item of correspondence involving either one of them. Accordingly, in this complaint, Compagnia di San Paolo and Fondaco SGR S.p.A. are collectively referred to as "Fondaco."

15. Defendant CARAC ("CARAC") is a non-profit organization governed by the French Code de la mutualité, Book number II, which provides insurance products. CARAC's primary place of business is in Neuilly-Sur-Seine, France.

**Jurisdiction and Venue**

16. This Court maintains subject matter jurisdiction over this action pursuant to 31 U.S.C. §3721(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question).

17. Venue is proper in this Court under 31 U.S.C. § 3732(a) because Defendants do business in the Southern District of New York as well as throughout the United States. In addition, venue in this district is appropriate because, pursuant to 28 C.F.R. § 9.4(e), the false claims described herein were submitted to the United States Attorney for the Southern District of New York.

18. The members of Cabot Square are the original source of, and have direct and independent knowledge of, all publicly disclosed information (if any) that the allegations herein are based upon. Cabot Square's members have gathered all the documentation and knowledge substantiating the

allegations herein.  Additionally, Cabot Square has voluntarily provided all such information to the Government prior to the filing of this action.

19.  The members of Cabot Square know that one or more of the Defendants have the propensity to act erratically and/or threateningly.  The members of Cabot Square have a reasonable basis to believe that one or more of the Defendants will retaliate against them in response to this Complaint.

## Background

### A.  The Madoff Securities Fraud

20.  In December 2008, Bernard L. Madoff Investment Securities LLC ("Madoff Securities") – a broker-dealer and investment adviser registered with the U.S. Securities and Exchange Commission ("SEC") that had been in operation since at least in or about 1960 – collapsed after its investment advisory business was revealed to be a massive fraud.  While Madoff and his accomplices had promised investors that their money would be invested in stocks, options, and other securities of well-known corporations, that money was in fact virtually never invested as promised.  Instead, the Madoff Securities investment advisory business operated as a massive Ponzi scheme in which some investors were paid with money "invested" by different investors, and other proceeds were simply stolen to personally benefit Madoff and the people around him.

21.  At the time of its collapse in December 2008, Madoff Securities maintained more than 4,000 investment advisory client accounts – many of which were themselves held by investment vehicles with hundreds or thousands of investors of their own – which purported to have a combined balance of approximately $65 billion.  In fact, Madoff Securities only had about $300 million in assets at the time.

22.     Almost immediately upon Madoff's arrest, Madoff Securities was placed in receivership by the SEC, and then into liquidation under the Securities Investor Protection Act of 1970 ("SIPA") by the Securities Investor Protection Corporation ("SIPC").  SIPC appointed, and the United States Bankruptcy Court for the Southern District of New York approved, a private attorney to act as trustee for the purposes of winding down Madoff Securities' business and collecting available assets for distribution to customers of the firm.  The SIPA trustee has successfully collected and distributed billions of dollars to Madoff Securities customers.

23.     Entirely separately, the United States Attorney for the Southern District of New York collected more than approximately $4 billion through civil and criminal forfeiture, which the Department of Justice announced would be distributed through the process of remission and mitigation under the auspices of the "Madoff Victim Fund."

B.  *Forfeiture, and the Process of Remission and Mitigation*

24.     By law, forfeited property belongs to the United States of America, which may retain it or, in an act of what the courts have described as "administrative grace," distribute it pursuant to the process of remission and mitigation.

25.     Remission and mitigation is governed by a set of regulations promulgated by the Department of Justice, set out at 28 Code of Federal Regulations, Part 9.  By regulation, the authority to grant remission and mitigation is delegated to the Chief of the Money Laundering and Asset Recovery Section ("MLARS") of the United States Department of Justice, Criminal Division.[1]

---

[1]     The forfeiture regulations refer to the "Chief, Asset Forfeiture and Money Laundering Section."  28 C.F.R. § 9.1(b)(2).  In or about 2017, the Asset Forfeiture and Money Laundering Section was renamed the Money Laundering and Asset Recovery Section.

26.     As set forth in the forfeiture regulations, remission or mitigation is available to "petitioners," who may be "an owner [of the property], a lienholder . . . , or a victim." 28 C.F.R. § 9.2. The regulations defined the term "victim" as follows:

> *Victim* means a person who has incurred a pecuniary loss as a direct result of the commission of the offense underlying a forfeiture. A drug user is not considered a victim of a drug trafficking offense under this definition. A victim does not include one who acquires a right to sue the perpetrator of the criminal offense for any loss by assignment, subrogation, inheritance, or otherwise from the actual victim, unless that person has acquired an actual ownership interest in the forfeited property; provided however, that if a victim has received compensation from insurance or any other source with respect to a pecuniary loss, remission may be granted to the third party who provided the compensation, up to the amount of the victim's pecuniary loss as defined in § 9.8(c).

*Id.*

27.     In several places, the forfeiture regulations stress that all victims must be treated equally, regardless of whether they have access to other forms of compensation for their losses. Thus, the regulations provide that:

- Remission should be granted "on a pro rata basis to recognized victims when [all] petitions cannot be granted in full due to the limited value of the forfeited property, 28 C.F.R. § 9.8(f).

- "Any petitioner granted remission pursuant to this part shall reimburse the [Department of Justice] for the amount received to the extent the individual later receives compensation for the loss of the property from any other source. The petitioner shall surrender the reimbursement upon payment from any secondary source." *Id.* § 9.8(g).

7

- "[T]he amount of remission shall not exceed the victim's share of the net proceeds of the forfeitures associated with the activity that caused the victim's loss." *Id.* § 9.8(i).

28.    Petitions for remission or mitigation must be "sworn to by the petitioner," "addressed to the Attorney General," and "submitted to the U.S. Attorney for the district in which the judicial forfeiture proceedings are brought." 28 C.F.R. § 9.4(e). The local U.S. Attorney shall then direct an investigation of the merits of the petition, and forward the results of that investigation along with the U.S. Attorney's recommendation as to whether to grant or deny a petition to the Chief of MLARS. The Chief of MLARS shall then "rule on the petition." *See id.* §§ 9.4(f)-(g).

29.    By long-standing Department of Justice policy, the investigation and initial recommendation as to whether to grant or deny a petition in particularly complex cases may be carried out by a Special Master appointed by the Department. *See* 28 C.F.R. § 9.9(c). In such cases, however, the Department of Justice itself (specifically, the Chief of MLARS) always must make the final determination as to whether to grant a petition.

### The Madoff Victim Fund

30.    In or about December 2012, the Department of Justice announced the creation of the Madoff Victim Fund the ("MVF"), to be administered by its Special Master Richard C. Breeden, the former Chairman of the SEC. The MVF is funded by the approximately $4 billion forfeited to the United States, and remains the property of the United States unless and until the Department of Justice decides to distribute it through the process of remission and mitigation, as described above.

31.    Over a period of months, Breeden and the MVF made numerous public announcements through the MVF website (www.madoffvictimfund.com) concerning eligibility

criteria for petitions to the forfeited funds – eligibility criteria that had been designed with the assistance of and approved by the Department of Justice. Even after the MVF began receiving and processing petitions, it continued to put out additional guidance to the public.

A. *Eligibility to Participate in the MVF*

32.     Each victim who filed a petition with the MVF was required to provide information about his, her or its losses; provide supporting documentation; and to represent and certify under penalty of perjury, among other things, that:

(1) All personal and transactional information and all disclosures regarding any recovery for the loss resulting from the Madoff Securities fraud are complete and accurate to the best of the victim's knowledge.

(2) Information regarding all accounts, whether showing a net investment or net withdrawals, has been provided.

(3) All accompanying documents in support of the petition to the MVF and documents submitted to the Madoff Securities SIPA trustee in support of any SIPA claim[2] are true, correct, and complete to the best of the victims' knowledge.

33.     Consistent with the forfeiture regulations, the MVF defines a "victim" as someone who took funds out of any of their other assets and invested them either directly or indirectly with Madoff Securities. The money used by the victim could have been withdrawn from a savings or checking account, or could have come from the sale of other investment or non-investment assets. The money could also have originated from a 401(k) or other retirement savings vehicle.

---

[2]     The MVF relies upon documents submitted to the SIPA trustee rather than requiring victims to resubmit them.

34.     As discussed above, many of Madoff Securities' customers were in fact other investment advisers, hedge funds, feeder funds, or otherwise some form of pooled investment vehicle.  Because the MVF requires that victims used their "own money" (and because the forfeiture regulations require that a petitioner must have suffered a "direct" financial loss as a result of the underlying fraud), investment managers and other investment vehicles are generally ineligible petitioners to the MVF.  That is, the MVF looks to the ultimate investor, rather than to intermediate investment vehicles, even though intermediate investment vehicles may have had legal title to assets under their management, as the proper petitioner.

35.     In the Madoff Securities SIPA liquidation, only "direct" customers of Madoff Securities are recognized, whereas "indirect" investors are not – even if those indirect investors are those ones who suffered the actual pecuniary loss from the fraud.

36.     So-called indirect investors often had their money placed with Madoff Securities through a series of intermediary entities. One group of investors may have placed their assets in Fund A, which invested in Fund B, which invested in Fund C, which ultimately invested in Madoff Securities. Other investors might have come in at the Fund B level, and still others at the Fund C level. The MVF recognizes all of these investors as eligible victims if they can satisfy the other conditions to a recovery, most importantly proving the amount of their net loss. The SIPA trustee, on the other hand, only recognizes Fund C as a customer.

37.     That is, while the MVF recognizes the ultimate investor and disregards intermediate investment vehicles, the SIPA liquidation recognizes the direct customers and disregards downstream investors.  In this way, the two systems work almost exactly opposite to one another.

B. *The MVF's Treatment of Collateral Recoveries*

38.     One of the consequences in this difference in methodology is that victims may have received compensation from a variety of places before they came to the MVF. For example, some investors – those ones who had accounts with Madoff Securities – may have received distributions from the SIPA trustee. Others, who invested through an intermediate fund, may have received money from that fund (or in many cases, in the liquidation of that fund) – and *that* money may have come from the SIPA trustee indirectly, or it may have come from the settlement of a lawsuit between the investor and the fund, or from some other source. Some investors were able to successfully get insurance coverage for at least a portion of their losses, and other investors got money from other places.

39.     The MVF recognizes that some victims have already received recoveries from sources outside the MVF, which it defines broadly as "collateral recoveries." When determining distributions, the MVF calculates individual victim payments based on what amount is required to bring an individual victim to a total percentage recovery of their eligible fraud loss – currently about 40%. To achieve an equitable outcome, the MVF takes collateral recoveries into account by reducing the size of a victim's allowed remission claim by the collateral recovery amount, and in some cases delaying payment to ensure pro rata distribution.

40.     Because the amount of recoveries from all sources received by a victim is part of the payment computation, every victim must provide periodic updates on their collateral recoveries from sources other than MVF. Absent disclosure of outside recoveries, some investors would be paid more than the recovery percentage being paid to everyone else, which is not allowed under the MVF. Indeed, absent disclosure of collateral recoveries, some victims would be paid more than the actual value of their loss, which is expressly prohibited by the forfeiture regulations.

41.     As discussed above, part of the certification victims were required to submit with their petitions was a sworn statement that the information provided was complete, and did not omit any deposits, withdrawals, recoveries or similar items relating to investments with Madoff Securities through any account. Failure to fully disclose information could result in a variety of sanctions, including disqualification of all claims.  Similarly, the MVF requires all victims – in their initial petitions and in periodic "collateral recovery update forms" – to disclose all collateral recoveries that they have already received from (i) SIPC, (ii) the SIPA liquidation or Madoff bankruptcy; (iii) litigation settlements; (iv) banks or fund managers; and (v) any other source relating to their investment in Madoff Securities.  If victims do not know what they might receive in the future, no estimate is required. However, victims must disclose the source of all reasonably likely future recoveries.

42.     The timely reporting and updating of collateral recoveries is so significant that even today – more than four years after the deadline to file petitions – the home page of the MVF website still prominently displays the requirement and links to a copy of the collateral recovery form (which the petitioner must swear to under penalty of perjury).

43.     Prior to any distributions, the MVF has required recognized victims to update their collateral recovery forms, including (if applicable) by affirmatively reporting that he, she, or it had not received any new collateral recovery.  If victims have not received any new recoveries since their claims were filed, or since the last update they provided to MVF, victims can use the website to confirm that they do not have any new recoveries to report.

C. *The MVF Claims Process To Date*

44.     On November 18, 2013, the United States Attorney for the Southern District of New York and the Asset Forfeiture and Money Laundering Section announced that victims of the fraud perpetrated through Madoff Securities could begin submitting petitions to the MVF.

45.     The deadline to file petitions to the MVF was April 30, 2014. The MVF announced that it had received in excess of 63,500 total petitions, of which the Department of Justice ultimately granted more than 39,000.

46.     The MVF reports that it has reviewed over 51,000 collateral recovery updates from victims, including nearly 10,000 updates provided by victims since the MVF's first distribution.

47.     To date, the MVF estimates most victims have updated their collateral recoveries one or more times since the time their claim was filed. For those victims who have not provided any update despite frequent requests, the MVF withholds additional payments until an update is received. Checks are only sent out when victims provide information about collateral recoveries or affirm that there have been no collateral recoveries.

48.     Beginning in December 2017, the MVF began distributing forfeited funds to recognized victims. According to the MVF, recognized victims have generally now received at least 40% of their cash losses in the Madoff Securities fraud – a remarkable achievement in a Ponzi scheme – with more than $2.7 billion remaining in the MVF to be distributed.

49.     Of the more than 28,000 recognized victims who have already been paid by the MVF, more than 17,000 victims reportedly had not previously received any recovery from any source.

50.     The success of the MVF in distributing forfeited funds to victims who had not previously been able to recover anything on account of their losses should have been an

13

unmitigated victory. But in reality, some petitioners – including the Defendants herein – falsely claim not to have received compensation from other sources when in fact they had already recovered millions of dollars. The petitions filed by these claimants, therefore, were false and fraudulent.

## The False Claims

51.    Defendant Fulcrum is in the business of buying and selling distressed assets, including Madoff Securities-related legal claims. Some of these legal claims originate from limited partnership ("LP") interests held by investors in feeder funds that were invested, directly or indirectly, in Madoff Securities. Fulcrum bought feeder fund investor claims by purchasing the rights to any and all recoveries associated with the original investment in the LP shares.

52.    Luxalpha is a Luxembourg based feeder fund that invested in Madoff Securities on behalf of its investors. The legal claims associated with Luxalpha LP interests ("Luxalpha legal claims") – that is, the claims belonging to Luxalpha investors – can be conceptually divided into at least two categories:  claims against Luxalpha itself (or more precisely, Luxalpha's own liquidation estate), and claims to the MVF.

53.    Defendants CARAC and Fondaco were LP investors in Luxalpha. They each entered into a separate agreement with Fulcrum to sell their Luxalpha legal claims, which included the Luxalpha liquidation claim components and MVF claim components.

54.    Fulcrum did not simply buy Fondaco and CARAC's claims, however – indeed, the forfeiture regulations prohibit the MVF component from being sold or otherwise assigned. As set forth above, a "victim" for purposes of the forfeiture laws "does not include one who acquires a right . . . by assignment."

14

55.     Instead, Fulcrum structured the MVF claim transactions as "participations."  In a "participation," a claim purchaser (here, Fulcrum) acquires all of the economic rights of the victim (here, Fondaco and, separately, CARAC) but does not step into the victim's shoes.  Rather, the victim continues to own its own claim, but is contractually obligated to act at the direction of the purchaser.  That is, the victim remains the "face" of the claim, but that face is really no more than a façade.  By structuring the transactions as participations, among other things, Fulcrum was able to disguise the fact that it had acquired Fondaco and CARAC's claims from third parties, including the MVF.

56.     In this case, CARAC and Fondaco were required to act at Fulcrum's directions, including by submitting claims to the MVF and providing information requested by the MVF. When the MVF made distributions, CARAC and Fondaco were required to simply pass that money on to Fulcrum.

57.     As set forth below, each of Fondaco and CARAC submitted false claim to the MVF – at the direction of Fulcrum and its principals – that failed to disclose collateral recoveries, and therefore artificially inflated the value of their losses.  The MVF approved and, upon information and belief, has made at least one and possibly two payments of millions of dollars on account of each of those claims.  Defendants would not have participated in these distributions if they properly disclosed the collateral recoveries.

A.  *The CARAC Claim*

58.     In or about April 2014, Fulcrum purchased a Luxalpha claim with a face value of approximately €17,652,430.48 in net invested capital ("NIC") from Asmar & Assayag, acting as agent on behalf of CARAC (the "CARAC Claim").  NIC is a measure of victim loss that is particularly relevant in the Madoff Securities context, and represents the total cash amount

invested by the client, less any cash redeemed from the investment.[3]  Both the SIPA trustee and the MVF use NIC (also known as "net equity") in determining the amount of allowed claims. Fulcrum paid approximately 40% of NIC for the CARAC Claim.  The trade settled in or about November 2014.

59.    Fulcrum subsequently split the CARAC claim in half, and sold the claim to the Luxalpha estate to a third party buyer.  But Fulcrum kept CARAC's MVF claim for itself.

60.    Under the Sale and Purchase Agreement for the CARAC Claim, CARAC was required to provide Fulcrum with copies of any documentation or correspondence received from or sent to the MVF.  Moreover, CARAC was required to get permission from Fulcrum before sending any information or documentation to the MVF, including any petition or collateral recovery update form.

61.    Fulcrum effectively controlled CARAC's interactions with the MVF.  Defendant Matthew Hamilton personally approved all correspondence between CARAC and the MVF, including CARAC's original petition and its responses to requests for information about collateral recoveries.

62.    At Fulcrum's instructions, CARAC submitted a petition to the MVF that claimed its NIC value as a loss, and reported no collateral recoveries.

63.    In or about August 2016, the MVF sent CARAC a "Collateral Recovery Update Reminder," which requested information about any collateral recoveries on account of the CARAC Claim.  The correspondence stated that "[t]he regulations governing the MVF require that all

---

[3]    NIC is simply a measure of "cash in" and "cash out."  It does not include, for example, interest or any other time value of money, even though "cash in" may have been paid years or decades earlier.  It also does not assign any value to the victim's expectations as reflected on their account statements.

recoveries you have received, or that you will receive, as compensation for losses on your Madoff-related investments ('collateral recoveries') be deducted from the amount of your claim against MVF. . . . Therefore, in order for MVF to complete the processing of your claim and before any cash payments can be distributed, **you must disclose any collateral recoveries you have received since your claim was originally submitted to the MVF.**" (Emphasis in original). The correspondence then stated that the MVF did not have any information about any collateral recoveries that CARAC may have received. CARAC promptly forwarded the correspondence to Fulcrum.

64.    On or about June 23, 2017, the MVF notified CARAC that the Department of Justice had approved its claim in the amount of $12,904,499.39. The "Final Determination Notice – Approval" also noted that CARAC had reported "collateral recoveries of $0.00."

B. *The Fondaco Claim*

65.    In or about May 2013, Fulcrum purchased a Luxalpha claim with a face value of approximately €13,593,405.58 in NIC from Fondaco, representing an investment managed on behalf of Compagnia di San Paolo (the "Fondaco Claim"). Fulcrum paid approximately 40% of NIC for the Fondaco Claim. The trade settled in or about August 2014.

66.    Under the Sale and Purchase Agreement for the Fondaco Claim, Fondaco was required to provide Fulcrum with copies of any documentation or correspondence received from or sent to the MVF. Moreover, Fondaco was required to get permission from Fulcrum before sending any information or documentation to the MVF, including any petition or collateral recovery update forms.

67.    Although Fulcrum had the same contractual rights to dictate interactions with the MVF for the Fondaco Claim as the Carac Claim, Fondaco exercised slightly more independence.

For example, when at one point a Fulcrum employee requested to listen on mute while a Fondaco representative spoke with the MVF's help desk on the telephone, Fondaco pushed back. In the end, on that occasion, Fondaco sent the MVF help desk an e-mail, which had been reviewed and approved by Fulcrum. When it approved the e-mail, Fulcrum explicitly asked not to be copied on the e-mail to the MVF, and simply to be apprised of any results.

68.     Defendant Matthew Hamilton personally approved all correspondence between Fondaco and the MVF, including Fondaco's original petition and its responses to requests for information about collateral recoveries.

69.     At Fulcrum's instructions, Fondaco submitted a petition to the MVF that claimed its NIC value as a loss, and reported no collateral recoveries.

70.     On or about September 23, 2016, the MVF sent Compagnia di San Paolo a "Collateral Recovery Update Reminder," which requested information about any collateral recoveries on account of the Fondaco Claim. The correspondence stated that "[t]he regulations governing the MVF require that all recoveries you have received, or that you will receive, as compensation for losses on your Madoff-related investments ('collateral recoveries') be deducted from the amount of your claim against MVF. . . . Therefore, in order for MVF to complete the processing of your claim and before any cash payments can be distributed, **you must disclose any collateral recoveries you have received since your claim was originally submitted to the MVF.**" (Emphasis in original). The correspondence then stated that the MVF did not have any information about any collateral recoveries that Fondaco may have received.

71.     On or about October 11, 2016, Fondaco forwarded the MVF's "Collateral Recovery Update Reminder" to Fulcrum, including to defendant Matthew Hamilton. Fondaco's Head of Compliance, AML and Legal wrote in a covering e-mail that Fondaco intended to report the

amount it had been paid when it sold the Fondaco Claim. In addition, Fondaco asked whether it should report a portion of the funds it received from the sale of Luxalpha shares held by Fondaco.

72.     Hamilton then engaged in a back-and-forth with Fondaco that lasted until February 2017, in an effort to convince Fondaco not to report any collateral recovery or even to squarely ask the MVF what had to be reported. For example, in a November 11, 2016 e-mail, an outside lawyer for Fondaco suggested that Fondaco would write to the MVF help desk to confirm its understanding that "If the Claimant sold its Claim, any amount received for the sale of the Claim **must be provided** to MVF, even though the Claim sale is governed by a confidentiality clause." (Emphasis in original).

73.     Hamilton refused to allow Fondaco to ask this question, and instead re-wrote it to ask an entirely different and irrelevant one. Later in the correspondence, after previously refusing to provide a legal opinion to Fondaco, Hamilton delayed Fondaco's response to the MVF by claiming he had "asked [Fulcrum's] outside legal advisors to provide me with a formal legal opinion." Upon information and belief, however, Hamilton never asked any outside lawyer to provide a formal legal opinion on what needed to be reported to the MVF, and certainly never shared any such information with Fondaco.

74.     On or about November 28, 2016, Fondaco informed Hamilton that "if we do not receive the legal opinion covering the points included in my latest email by the end of this week, we will ask our Luxembourg-based legal advisor to forward our questions to MVF." Hamilton replied:

> We are seeking the opinion. Do not contact MVF without our consent. Our contract has strict terms around cooperation and we are specifically directing you to hold off on communications until we give the go ahead.

75.     In response, Fondaco explained (alluding to the participation structure of the transaction) "as long as Compagnia di San Paolo is responsible, you cannot force us to take or not to take an action that may cause a breach of law."

76.     Ultimately, Fulcrum failed to provide any legal opinion, and Fondaco provided a draft letter that it intended to send to the MVF. For reasons that are not clear, however, the draft letter reported only that Fondaco "sold its claim to a secondary market player and on August 6, 2014 received EUR 250,000." Upon information and belief, this referred to a specific portion of the Fondaco Claim. In any event, Fondaco did not report the millions of dollars it had been paid by Fulcrum for the Fondaco Claim.

77.     On or about June 29, 2017, the MVF notified Fondaco that the Department of Justice had approved its claim in the amount of $13,890,891.95. The "Final Determination Notice – Approval" also noted that Fondaco had reported "collateral recoveries of $0.00."

C. *The Defendants Knowingly Submitted False Claims*

78.     Defendants Fulcrum, Hamilton, and Horrigan knowingly caused defendants CARAC and Fondaco to submit false claims insofar as they failed to report the millions of dollars received by CARAC and Fondaco from Fulcrum. For example, as set forth above, Hamilton lied to Fondaco about having an outside lawyer provide a formal legal opinion regarding claim eligibility.

79.     On or about July 26, 2017, a Fulcrum employee sent an e-mail to, among others, Hamilton and Horrigan stating "Based on the MVF form, it sounds like we need to have Carac and Fondaco go into the MVF website and complete a certification form." Upon information and belief, this e-mail referred to the requirement in the "Final Determination Notice – Approval" form

that victims update their collateral recoveries of "certify to MVF that no such recoveries were received" before any allowed petitions were paid.

80.     In response, Hamilton and Horrigan directed Fondaco and CARAC not to report any collateral recoveries.  At the time, they knew this to be improper.

81.     For example, on or about August 3, 2017, a Fulcrum employee sent an e-mail to Hamilton, Horrigan, and others reporting on a conversation the employee had with another participant in the market for Madoff Securities claims.  Discussing collateral recoveries, the employee reported that "The MVF has recently updated its website to provide guidance for creditors in reporting prior recoveries.  The creditor should only include the recoveries it received for its own account so, in this case, the SIPC Advance, 1st SIPC Distribution and the Purchase Price it received when it sold its claim."  The employee then asked for information about the purchase price on a different MVF claim brokered by Fulcrum, so that the purchaser could accurately report the sale price as a collateral recovery to the MVF.

82.     Later the same day, the same employee e-mailed Hamilton, Horrigan, and others the latest update from the MVF website, which include this question and answer:

> **Q1:  I am still confused about what counts as a "collateral recovery".  What is included?**
>
> MVF previously sent you a collateral recovery update request explaining that: "Collateral recoveries include bankruptcy distributions, litigation recoveries, settlement proceeds, insurance recoveries, or any other compensation received for your Madoff losses."  Essentially, anything you received from anyone due to your Madoff loss is a collateral recovery.  In particular, you need to report to MVF all payouts from the Madoff bankruptcy, as well as any proceeds you received as a result of the sale or assignment of your claim in either the bankruptcy of MVF proceedings.

83.     Notwithstanding this clear guidance by the MVF that, "in particular," victims need to report "the proceeds you received as a result of the sale or assignment of your claim," Fulcrum,

Hamilton, and Horrigan directed Fondaco and CARAC not to report the millions of dollars that Fulcrum had paid them for their claims.

84.    As a result of the Fondaco Claim and the CARAC Claim, Fondaco and CARAC received millions of dollars from the MVF, which they passed on to Fulcrum. Those payments would have been eliminated or reduced had Fondaco and CARAC accurately and correctly reported their collateral recoveries.

85.    Defendants accepted and received those distributions knowing they had failed to disclose the collateral recoveries, and knowing that their failure to disclose that information was material to the decision of the MVF and Department of Justice with respect to both the amount and timing of receipt of such distributions.

86.    Upon information and belief, Defendants have thus far received in excess of $7 million in remissions from the MVF as a result of the false claims alleged herein.

## FIRST CAUSE OF ACTION

### *Violation of the False Claims Act*

87.    Cabot Square incorporates and re-alleges the allegations in paragraphs 1-86 as if fully set forth herein.

88.    Based upon the acts described above, Defendants:

a.  Knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval to the MVF and, through it, to the United States Department of Justice; and

b.  Knowingly made, used or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.

22

89.     The United States, unaware of the falsity of these claims, records, and statements made by Defendants, and in reliance on the accuracy thereof, paid money to Defendants through the MVF.  The Defendants have failed to repay to the United States the funds disbursed by the MVF, and no repayment has occurred to date.

90.     The United States and the general public have been damaged as a result of Defendants' violations of the False Claims Act.

## SECOND CAUSE OF ACTION

### *Conspiracy to Submit a False Claim*

91.     Cabot Square incorporates and re-alleges the allegations in paragraphs 1-86 as if fully set forth herein.

92.     Defendants knowingly conspired together to cause a false or fraudulent claim to be allowed by the United States.

93.     CARAC and Fondaco each performed an act to effect the object of the conspiracy. Specifically, CARAC, Fondaco SGR S.p.A., and Compagnia di San Paolo participated in a scheme with Fulcrum, Hamilton, and Horrigan whereby CARAC and Fondaco each held themselves out to the MVF as victims entitled to full recovery of funds invested with Madoff Securities, while knowingly agreeing with Fulcrum, Hamilton, and Horrigan to misrepresent to the MVF the existence or extent of the collateral recoveries received by CARAC and Fondaco.

94.     The United States, unaware of the falsity of these claims, records, and statements made by Defendants, and in reliance on the accuracy thereof, paid money to Defendants.

95.     The United States and the general public have been damaged as a result of Defendant's violations of the False Claims Act.

## PRAYER FOR RELIEF

96.     Cabot Square, on behalf of the United States, respectfully requests this Court to find that Defendants have damaged the United States Government as a result of its conduct under the False Claims Act.  Cabot Square prays that judgment enter against Defendants as follows:

a.     That the defendants cease and desist from violating the False Claims Act;

b.     That the Court enter judgment against Defendants in an amount equal to three times the amount of damages sustained by the United States as a result of Defendants' actions, and a civil penalty of $11,000 for each violation of 31 U.S.C. § 3729;

c.     That the United States be awarded pre-judgment and post-judgment interest;

d.     That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. §§ 3730(b) and (d) of the False Claims Act.

e.     That Relator be awarded all costs and expenses of this action, including attorneys' fees; and

f.     That the United States and Relator receive such other relief as the Court deems just and proper.

## **JURY DEMAND**

97.    Relator hereby demands trial by jury.

Dated: October 5, 2018

<div style="margin-left: 50%;">

Respectfully Submitted,

By: _____
Matthew L. Schwartz
Boies Schiller Flexner LLP
575 Lexington Ave, 7th Fl.
New York, New York 10022

Jeffrey S. Shelly
Teresa Monroe
Boies Schiller Flexner LLP
30 South Pearl Street, 11th Fl.
Albany, New York 12207

</div>

## CERTIFICATE OF SERVICE

I, Matthew L. Schwartz, certify that on October 5, 2018, a true and correct copy of the

foregoing has been served on counsel for the United States of America via overnight delivery.

Hon. Jefferson B. Sessions
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530-0001

Hon. Geoffrey S. Berman
United States Attorney
for the Southern District of New York
1 Saint Andrews Plaza
New York, New York 1007

Matthew L. Schwartz